**William L. RIDENOUR, Plaintiff,**

v.

**Terry COLLINS, et al., Defendants.**

**Case No. 2:08–cv–682.**

United States District Court,
S.D. Ohio,
Eastern Division.

Feb. 10, 2010.

William L. Ridenour, Chillicothe, OH, pro se.

J. Eric Holloway, Ohio Attorney General's Office, Ryan G. Dolan, Attorney General of Ohio, Columbus, OH, for Defendants.

## *OPINION AND ORDER*

GREGORY L. FROST, District Judge.

This matter is before the Court to consider the Report and Recommendation issued by the Magistrate Judge on December 2, 2009(# 78). The Magistrate Judge recommended that the defendants' motion for summary judgment (# 54) be granted and that this action be dismissed. The Magistrate Judge, in connection with this recommendation, also ruled on several nondispositive motions. The motions of plaintiff William Ridenour for extension of time for completion of discovery (# 44), for judicial notice (## 47, 48), to compel discovery (# 53), to provide a copy of his memorandum with attachments (# 63), for leave to file an amended complaint (# 64), and to strike the affidavit of Cynthia Mausser (# 69) were denied. The defen-

dants' motion *in limine* (# 66) was also denied. Mr. Ridenour's motion to supplement the summary judgment record (# 72) was granted.

On December 15, 2009, Mr. Ridenour filed an objection (# 81) to the Report and Recommendation. He asks this Court to reject the recommended disposition of the defendants' summary judgment motion and to reconsider the Magistrate Judge's denial of his various motions. On January 15, 2010, the defendants filed their response to Mr. Ridenour's objection. For the following reasons, the Court overrules Mr. Ridenour's objection and adopts the Report and Recommendation in its entirety.

## I. STANDARD OF REVIEW

When objections are received to a report and recommendation on a dispositive matter, the District Judge "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b)(3). After review, the District Judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.; see also* 28 U.S.C. § 636(b)(1)(C).

In reviewing a magistrate judge's ruling on a nondispositive matter, the District Judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). Under the "clearly erroneous" standard, the district court must affirm the magistrate judge's order unless it has a definite and firm conviction that a mistake has occurred. *In re Search Warrants Issued Aug. 29, 1994,* 889 F.Supp. 296, 298 (S.D.Ohio 1995). A district court's review under the "contrary to law" standard is plenary, and the court may set aside any legal conclusions that

"contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent." *Gandee v. Glaser,* 785 F.Supp. 684, 686 (S.D.Ohio 1992).

## II. OBJECTIONS TO NONDISPOSITIVE MOTIONS

A. *Plaintiff's Motion to Extend Pretrial Deadlines*

Mr. Ridenour argues that he never had an opportunity to complete adequate discovery because the defendants refused to provide sufficient answers to his interrogatories, requests for admission, and requests for production. He specifically objects to the defendants' redaction of information based on their alleged security and privacy concerns. In his view, the defendants should have been required to seek a protective order rather than redacting such information on their own. Mr. Ridenour asserts that had the defendants moved for a protective order, the Magistrate Judge could have made an *in camera* inspection of the documents to determine whether he was entitled to the information in unredacted form. Mr. Ridenour also contends that the Magistrate Judge should have granted him a continuance pursuant to Fed.R.Civ.P. 56(f) to conduct further discovery prior to issuing a Report and Recommendation on the defendants' summary judgment motion.

The burden lies on the party seeking discovery to proffer facts demonstrating that the evidence sought actually exists and is sufficient to preclude summary judgment. *Chance v. Pac–Tel Teletrac Inc.,* 242 F.3d 1151, 1161 n. 6 (9th Cir. 2001). The Court concludes that Mr. Ridenour has not satisfied that burden. In his affidavit, he claims that it is absolutely essential that he receive the statistics for prisoners paroled in 1972. Not only has he failed to establish a reasonable likeli-

hood that these statistics exist, he has also failed to show how they might preclude summary judgment in light of the fact that he did not become eligible for parole until 1982. Whether Mr. Ridenour is entitled to the redacted materials will be addressed in the context of his second motion to compel.

### B. *Plaintiff's Motions to Take Judicial Notice*

Mr. Ridenour acknowledges that the Magistrate Judge correctly outlined the facts which were the subject of his requests for judicial notice. He contends, however, that the Magistrate Judge misconstrued his request that the Court take judicial notice of the fact that the defendants misapplied Ohio Rev.Code §§ 2903.02 and 2967.13 to increase, or even eliminate, his minimum parole eligibility. Mr. Ridenour also maintains that the Court should take judicial notice of the testimony of Beverly Seymour and John Gerhart before the Senate Finance & Financial Committee because their testimony is in the public record and is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

The Magistrate Judge determined that it is inappropriate to take judicial notice of the Ohio statutes Mr. Ridenour believes the defendants misapplied, and that Ohio law is simply a matter for the Court to interpret. *See United States v. Dedman,* 527 F.3d 577, 586 (6th Cir.2008). Mr. Ridenour has not shown that this determination is contrary to law. The question of whether the defendants misapplied the law and thereby violated his rights under the Ex Post Facto Clause is the central issue in this lawsuit and is clearly disputed. Thus, the statutes at issue do not fall within the framework of Fed.R.Evid. 201(b) for taking judicial notice.

The Court also is not required to take judicial notice of the testimony of Ms. Seymour and Mr. Gerhart. While the fact that they testified before the Ohio Senate committee may not be open to dispute, the contents of their testimony, particularly when offered for the truth of the matters asserted, evince considerable dispute. *See United States v. Bonds,* 12 F.3d 540, 553 (6th Cir.1993) (court not required to take judicial notice of National Research Committee report where significance of its contents was disputed); *Deal v. Hamilton County Bd. of Educ.,* 392 F.3d 840, 852–53 (6th Cir.2004) (district court did not abuse its discretion in refusing to take judicial notice of declarations filed by school system expert in unrelated case).

Lastly, Mr. Ridenour claims that a newspaper article he submitted should not be excluded because it allegedly shows that the time served for two counts of first degree murder was on average fourteen years, even where one of the victims was a police officer. He asserts that the Court should take judicial notice of this "fact" and draw any inferences in his favor.

Mr. Ridenour did not, however, ask the Court to take judicial notice of this newspaper article. In his second motion for judicial notice, the only newspaper article to which he referred was an item by Dawson Bell in the Free Press about Michigan parolees who had turned their lives around. The article he describes in his objection appears to be the one in the Dayton Daily News which was attached as Exhibit M to his memorandum opposing summary judgment. Regardless of whether Mr. Ridenour originally sought judicial notice of the article, it cannot be used for the purpose of showing that the average time served by an inmate for two counts of first degree murder was fourteen years. *See Cofield v. Alabama Public Service Comm'n,* 936 F.2d 512, 517 (11th Cir.1991)

(that a statement appears in a newspaper does not establish that the statement is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned).

### C. *Plaintiff's Second Motion to Compel*

Mr. Ridenour observes that the Magistrate Judge denied his second motion to compel production of parole statistics from 1972 to 1976 on the ground that the defendants cannot be compelled to produce documents that do not exist or which they do not possess or control. He contends, however, that the defendants never denied that they possessed the raw data to compile those statistics, but maintained only that they had not yet done so. Mr. Ridenour also objects to the Magistrate Judge's finding that certain redacted information is not relevant without first conducting an *in camera* inspection. In his view, the Magistrate Judge's purported reliance on the defendants' self-serving statements regarding the redacted information was contrary to the standard for summary judgment.

Before the movant is entitled to an *in camera* inspection of documents, he must show a reasonable probability that they contain relevant evidence. *Brown v. Sheets*, No. 2:06–cv–448, 2007 WL 3024456 at *21 (S.D.Ohio Oct. 15, 2007). Again, Mr. Ridenour has not done so. Accordingly, the Magistrate Judge could rule on the second motion to compel without first conducting an *in camera* inspection. *See Wolfel v. United States*, 711 F.2d 66, 67 (6th Cir.1983) (district court did not err in reaching conclusion about documents requested under the Freedom of Information Act without utilizing an *in camera* inspection).

### D. *Plaintiff's Motion for Copy of Document 57 and Attachments*

Mr. Ridenour claims that he needs a copy of his memorandum in opposition to the defendants' summary judgment motion, together with its attachments, in order to properly submit his objections to the Magistrate Judge's Report and Recommendation, and that without such a copy, he will suffer irreparable prejudice. He further states that he relied on the Clerk's alleged past practice of providing him with a date-stamped copy of all documents he filed, and that to now deny such copies is fundamentally unfair and prejudicial.

The record shows that Mr. Ridenour was able to prepare and file a thirty-six page objection to the Report and Recommendation despite the fact that he did not retain a copy of his memorandum in opposition to the defendants' summary judgment motion with attachments. He has not demonstrated how the lack of a copy of document # 57 prejudiced him in the preparation and filing of his objection. He has also failed to establish any past practice by the Clerk to mail him a time-stamped copy of his pleadings and other papers even when he did not provide extra copies at the time of filing or that he is legally entitled to rely on such a practice. For these reasons, the Court concludes that the Magistrate Judge's denial of his request for a copy of document # 57 was not contrary to law.

### E. *Plaintiff's Motion for Leave to File Amended Complaint*

Mr. Ridenour raises several objections to the Magistrate Judge's denial of his motion for leave to file an amended complaint. First, he argues that the Court should grant leave to amend to add a new legal claim because the proposed claim allegedly arises out of the same transaction or occurrence as his other claims. He further asserts that this amendment should relate back to the commencement of this case since the new parties to be

added are the same John Doe defendants listed in his original complaint and the new separation of powers claim is nothing more than an outgrowth of his Ex Post Facto claim against all of the defendants. Because the Magistrate Judge's decision to deny leave to add the separation of powers claim was based in part on grounds of futility, the Court will conduct a de novo review of that portion of the decision. *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir.2008) (when district court bases its denial of leave to amend on futility ground, court of appeals will review that decision de novo).

Assuming that the proposed amendment, if granted, would relate back to the original complaint, Mr. Ridenour still must show that his proposed claim would survive a motion to dismiss. The Court of Appeals for the Sixth Circuit has held that a claim based on the separation of powers between a state trial judge and a state prosecutor is a matter of state law that is not cognizable for purposes of federal habeas review. *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir.2000). The Northern District of Ohio subsequently determined that an inmate's claim based on the separation of powers between state parole board members and the trial court is similarly a matter of state law, and not federal law. *Louis v. Collins*, No. 3:08 CV 930, 2008 WL 2705038 at *6 (N.D.Ohio Jul. 8, 2008). Based on its own review of these decisions, the Court concludes that permitting Mr. Ridenour to amend his complaint to add the proposed separation of powers claim would be futile. Given the requirement that a § 1983 plaintiff show that the defendants deprived him of a federal statutory or constitutional right, such a claim could not survive a motion to dismiss.

In his second objection to the denial of his motion to amend, Mr. Ridenour contends that, contrary to the Magistrate Judge's understanding of this suit as purely an official capacity action, the allegations in his complaint should have alerted these proposed defendants to his intention to hold them personally liable for damages. This Court does not agree and will overrule the objection.

In *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir.1989), the Sixth Circuit held that plaintiffs seeking damages under § 1983 must clearly set forth in their pleadings that they are suing state officials in their individual capacity. The Sixth Circuit later clarified *Wells* and explained that the failure to state explicitly whether a defendant is sued in his individual capacity, however, "is not fatal if the course of proceedings otherwise indicates that the defendant[s] received sufficient notice." *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir.2001) (en banc), *cert. denied*, 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002).

In this case, the course of proceedings clearly indicate that Mr. Ridenour sued the defendants in their official capacity only. On the face of his complaint, the name of each defendant is followed by the defendant's title and the phrase "In His Official Capacity." Even the John Doe defendants identified as unknown parole board member and/or other officials are characterized in this manner. In addition, the complaint seeks only declaratory and injunctive relief, not damages. The sole factor offered by Mr. Ridenour in support of his argument is that the defendants' answer asserts a defense of qualified immunity "[t]o the extent Plaintiff intends to seek any monetary damages." Mr. Ridenour did not indicate that he was seeking monetary damages until after discovery closed and the defendants filed their motion for summary judgment. Under these circumstances, he has not satisfied the "course of proceedings" test.

In Mr. Ridenour's third and final objection, he takes issue with the Magistrate Judge's determination that he should have sought leave to amend at a much earlier date. Mr. Ridenour apparently believes that because the scheduling order did not provide a specific deadline for amendment of pleadings, his delay in seeking leave to amend until after discovery had closed and the defendants had filed their motion for summary judgment should not factor in the Court's decision. The Magistrate Judge, however, did not base his denial of leave to amend on the scheduling order entered in this case, but rather on the standard set forth in Fed.R.Civ.P. 15(a) that "leave be freely granted when justice so requires." Under this standard, the Magistrate Judge clearly had discretion to consider the prejudice to the defendants which would entail if leave to amend were granted at this stage of the proceedings. *See Inge v. Rock Financial Corp.,* 388 F.3d 930, 937–38 (6th Cir.2004) (district court did not abuse its discretion in denying plaintiff leave to amend where all significant discovery had been completed and the dispositive motion deadline had passed). Accordingly, the Magistrate Judge's decision to deny Mr. Ridenour leave to amend his complaint was not contrary to law.

#### F. *Defendants' Motion to Bar Use of Inadmissible Evidence*

Mr. Ridenour notes that the Magistrate Judge denied the defendants' motion *in limine* because it could not be said that the documents in question have no probative value. Even though the Magistrate Judge denied the defendants' motion *in limine,* Mr. Ridenour seems to be arguing that in resolving motions for summary judgment, the Court must not make credibility determinations or weigh evidence. He then goes on to do just that by arguing that his sixty-two exhibits entitle him, and not the defendants, to summary judgment.

Because the Magistrate Judge decided the defendants' motion in Mr. Ridenour's favor, he has no grounds for seeking reconsideration. *Pride v. BIC Corp.,* 218 F.3d 566, 576 (6th Cir.2000). Furthermore, Mr. Ridenour has not moved for summary judgment, and no such motion is the subject of the Report and Recommendation. Therefore, the Court will not entertain his objection on this ground.

#### G. *Plaintiff's Motion to Strike Affidavit of Cynthia Mausser*

Mr. Ridenour claims that first and foremost, Cynthia Mausser's affidavit contradicts the defendants' answers to his requests for admission. He queries which is more credible, Ms. Mausser's affidavit or the sworn statements of Linda Janes? He then points out that such credibility determinations are for the jury, and that all justifiable inferences must be construed in his favor for purposes of summary judgment.

The Magistrate Judge found that the two statements are not contradictory, and that finding is not clearly erroneous. Absent a direct contradiction, a court should not strike an affidavit. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.,* 448 F.3d 899, 909 (6th Cir.2006). Even if the statements contradicted each other, they were made by different individuals. While there is support for the proposition that the non-moving party may not create a disputed issue of fact by filing an affidavit that contradicts that party's earlier deposition testimony, *see, e.g., Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir. 1997), that is not the case here. Furthermore, questions as to the credibility of the statements in Ms. Mausser's affidavit do not preclude summary judgment. *See Del Valle v. BellSouth Telecommunications, Inc.,* 200 Fed.Appx. 528 (6th Cir.2006) (respondent may not defeat summary judg-

ment motion by arguing that movant's evidence may not be credible, but must present affirmative evidence supporting its case). Accordingly, Mr. Ridenour has not shown that the Magistrate Judge's denial of his motion to strike the affidavit is contrary to law.

H. *Plaintiff's Motion to Supplement Summary Judgment Record*

Mr. Ridenour quotes language from the portion of the Report and Recommendation resolving his motion to supplement the summary judgment record. The Magistrate Judge granted his motion, but Mr. Ridenour apparently takes issue with the statement that "the Court can give this evidence whatever weight it deserves." Mr. Ridenour submits that it is not the Court's province to weigh evidence in summary judgment proceedings.

Because the Magistrate Judge decided the motion to supplement the summary judgment record in Mr. Ridenour's favor, he has no grounds for seeking reconsideration. *Pride,* 218 F.3d at 576. But assuming such grounds existed, the Magistrate Judge's statement was not contrary to law. While courts generally may not weigh evidence in resolving summary judgment motions, the quantity and quality of the evidence submitted to create an issue of material fact must be sufficient to support a jury verdict. *See Thompson Everett, Inc. v. National Cable Advertising, L.P.,* 57 F.3d 1317, 1323 (4th Cir. 1995). Put another way, "[t]he nonmoving party must present significant probative evidence to show that there is more than some metaphysical doubt as to the material facts." *Frazier v. Honda of America Mfg., Inc.,* 431 F.3d 563, 565–66 (6th Cir. 2005). If the evidence is merely colorable, summary judgment may be granted. *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 204 (6th Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus,

some weighing of the evidence in order to determine the existence of material facts is unavoidable.

## III. OBJECTIONS TO RECOMMENDED DISPOSITION ON SUMMARY JUDGMENT

A. *Standard of Review for Summary Judgment*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R.CivP. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir.2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 234 (6th Cir.2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie,* 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.' ". *Hamad,* 328 F.3d at 234–35 (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505).

With this standard in mind, the Court will determine de novo those portions of the Magistrate Judge's recommended disposition to which Mr. Ridenour properly objected. These include the Magistrate Judge's conclusions that the parole board either did not apply the following statutes and guidelines retroactively at Mr. Ridenour's May 23, 2008 parole hearing or that their application to his parole suitability did not violate the Ex Post Facto Clause of the United States Constitution.

**B.** *Retroactive Application of OAC § 5120:1–1–07*

This guideline permits the parole board to determine that an inmate not be released at the time of his parole eligibility where there is substantial reason to believe that, *due to the serious nature of the crime,* the release would create an undue risk to public safety or would not further the interest of justice nor be consistent with the security and welfare of society. Ohio Admin. Code § 5120:1–1–07(A)(2) (emphasis added). Mr. Ridenour contended in his memorandum in opposition to summary judgment that OAC 5120:1–1–07(A)(2) constitutes an ex post facto law because the "serious nature of the crime" factor was not part of the parole scheme in effect when he was convicted and sentenced in 1972. The Magistrate Judge determined that this factor had been a part of the parole guidelines since 1975, and possibly earlier. In his objection, Mr. Ridenour now clarifies that "he was referring to the fact that [this provision] was not part of the previous parole scheme exclusively or in isolation." He further elaborates that in 1972 whether an inmate had been rehabilitated and the nature of the crime were given equal weight in parole determinations, but that now rehabilitation is no longer a part of the equation.

Mr. Ridenour's contention that an inmate's rehabilitation is no longer a factor in the board's decision to grant or deny parole is incorrect. Not only does the current version of 5120:1–1–07(B) require the board to consider "[a]ny reports prepared by any institutional staff member relating to the inmate's personality, social history, and adjustment to any institutional programs and assignments" and "[t]he inmate's vocational, education, and other training," the decision denying Mr. Ridenour's release specifically noted that he had completed a number of programs and had excellent institutional conduct for the past thirty years.

**C.** *Retroactive Application of R.C. § 2967.13*

This statute, which became effective in 2002, changed the parole eligibility date for prisoners serving either a life sentence or a sentence with a minimum term of fifteen years. Because Mr. Ridenour became eligible for parole in 1982, some twenty years before this version of § 2967.13 went into effect, the Magistrate Judge found that its application could not have impacted the board's decision in 2008 to deny parole. Mr. Ridenour nevertheless believes that the board's retroactive application of the 2002 change, when coupled with the 2007 parole guidelines, effectively eliminated the possibility that he will ever be suitable for release. The Magistrate Judge found that he failed to show that the parole board even considered the 2007 Parole Guidelines when it determined he was not suitable for release, but that, in any event, application of the 2007 guidelines would not have had any adverse impact on the board's decision whether or not to grant him parole. Mr. Ridenour challenges these findings in his objection.

Mr. Ridenour's argument is based on his belief that the parole board considers his

minimum sentence to be life imprisonment. This belief is illogical given the fact that life imprisonment is his maximum sentence. It is also inconsistent with the fact that the board has scheduled another hearing for Mr. Ridenour for May 1, 2012. If his minimum sentence is life imprisonment under the 2007 Parole Guidelines, there would be no reason to conduct any future hearings to determine his suitability for parole. Furthermore, at least one of the board members specifically indicated that he would consider releasing Mr. Ridenour after he had served forty years. If the guidelines truly provided for a minimum sentence of life imprisonment, as Mr. Ridenour contends, there would be no rationale for releasing him after forty years. Accordingly, as the Magistrate Judge concluded, there is no basis for Mr. Ridenour's claim that he faces a significant risk of serving longer than he would have under the parole standards in effect at the time of his conviction and sentence. *See Nur v. Mausser,* No. 1:08 CV 110, 2008 WL 1775249 at *3 (N.D.Ohio Apr. 15, 2008).

### D. *Retroactive application of R.C. § 2903.02*

Ohio Rev.Code § 2903.02 provides that "[n]o person shall purposely cause the death of another" and that "[w]hoever violates this section is guilty of murder." The punishment for committing murder in violation of O.R.C. § 2903.02 is an indefinite term of fifteen years to life. *See* Ohio Rev.Code § 2929.02. There is nothing in the statute to indicate that the legislature intended it to apply retroactively.

Mr. Ridenour states that the problem with the retroactive application of this statute is that it allegedly "creates a sufficient risk of increasing the measure of punishment attached to the covered crimes." Once again he quotes from the 2007 parole guidelines that any "distinctions between the seriousness of the of-

fenses will be addressed by the different minimum sentences required to be served before release eligibility, and when determining release suitability." Mr. Ridenour points out that the minimum sentence he was required to serve before becoming eligible for parole was ten years. *See* Ohio Rev.Code § 2967.13 (eff. 3–28–1965). The minimum sentence under § 2903.02 is fifteen years. Mr. Ridenour maintains that because the seriousness of the offense and parole suitability are allegedly conditioned upon the different minimum sentences, he is disadvantaged by the five-year increase.

Mr. Ridenour does not address the Magistrate Judge's finding that there is no evidence that the parole board denied Mr. Ridenour's release because it considered him ineligible for parole. He also ignores the fact that in the unlikely event that the board applied § 2903.02 to him at his May 23, 2008 hearing, there would have been no practical effect because he had already served more than fifteen years. Therefore, to the extent that the seriousness of the offense and parole suitability are conditioned upon the different minimum sentences, Mr. Ridenour cannot show that he was disadvantaged by the five-year increase in the minimum sentence for murder.

### E. *Retroactive Application of Violent Offender Policies*

Mr. Ridenour argues that the certification by Director Wilkinson dated August 12, 1996, that the State of Ohio "has implemented, or will implement, correctional policies and programs, including Truth–in–Sentencing laws that ensure that violent offenders serve a substantial portion of the sentences imposed ...," raises at a minimum a factual dispute as to whether the parole board retroactively applied the Violent Crime Control and Law Enforcement Act of 1994 to increase the time he must

serve before being found suitable for release.

The Court finds that the promises made by Director Wilkinson do not create a disputed issue of material fact. By the time his May 23, 2008 parole hearing took place, there is no doubt that Mr. Ridenour had already served a substantial portion of his sentence. Accordingly, there is no reason to believe that Director Wilkinson's statement had any effect on the board's decision to deny parole.

### F. Retroactive Application of Ohio's Victims' Rights Statutes

Mr. Ridenour claims that Ohio's victims' rights statutes are not merely procedural because a representative of the victim's rights organization can actually stop the release of someone who has been granted parole. He thus contends that *Clumm v. Warden, Chillicothe Correctional Institution*, No. 2:08–cv–365, 2008 WL 4346797 (S.D.Ohio Sep. 8, 2008), which held to the contrary, was wrongly decided.

Mr. Ridenour's contention that a victim's representative can stop the release of an inmate granted parole is simply not accurate. While the victim's representative and immediate family may object to a panel's recommendation for parole and request a hearing before the full board, which must be granted, "the board may approve or disapprove the recommendation or defer its decision until a subsequent full board hearing." Ohio Rev.Code § 5149.101(C). Accordingly, the board retains its full discretion as to the grant or denial of parole. *Clumm*, 2008 WL 4346797 at *3. For this reason, the Court agrees with Judge Marbley that the Ohio's victims' rights statutes are "merely procedural and [do] not increase a prisoner's punishment." *See id.* Even where applied retroactively, such statutes cannot violate the Ex Post Facto Clause.

### G. Practical Implementation of Current Parole Statutes, Regulations, Guidelines, and Policies

Mr. Ridenour points out that by the time of his next parole hearing, he will have served forty years. He asserts the fact that Tony Logsdon, who likewise was convicted of two counts of second degree murder, served only thirty years is circumstantial evidence that the applicable parole standard for each count of second degree murder formerly was fifteen years. He also argues that Derek Farmer and his co-defendant served an average of fourteen years for two counts of first degree murder where the victims were an eighty year old man and a police officer. By his calculation, the average time served for all three of these prisoners was twenty-two years. In comparison, he will have served more than eighteen years longer.

The examples cited by Mr. Ridenour do not create a genuine issue of material fact that fifteen years per homicide was ever the standard for releasing an inmate convicted of murder because these inmates are not similarly situated to him. In addition to his second degree murder convictions, he was also found guilty of several other serious felonies, including escape and kidnaping. Mr. Ridenour again complains that had the defendants cooperated in discovery, he would have had actual statistics showing the time served for similarly situated inmates in 1972. As previously noted, however, he has not shown any likelihood that such statistics even exist. More importantly, the parole statistics that actually do exist show that there are no inmates similarly situated to Mr. Ridenour. *See* Affidavit of Steve Van Dine ¶ 6.

### IV. CONCLUSION

Based on the foregoing reasons, the Court overrules Mr. Ridenour's objection (# 81) and adopts the Report and Recom-

mendation (# 78) in its entirety, including the Magistrate Judge's orders on nondispositive motions. The Court further GRANTS the defendants' motion for summary judgment (# 54). The Clerk shall terminate this action.

**IT IS SO ORDERED.**

### ORDER AND REPORT AND RECOMMENDATION

TERENCE P. KEMP, United States Magistrate Judge.

William Ridenour, a state prisoner, filed this § 1983 action seeking declaratory and injunctive relief against the Director of the Ohio Department of Rehabilitation and Correction, the Chief of the Ohio Adult Parole Authority, and the Chairperson of the OAPA. The complaint also lists as defendants various unknown parole board members and/or other officials. All of the defendants are sued in their official capacity only.

Mr. Ridenour alleges that the defendants conducted his parole hearing on May 23, 2008, in a constitutionally impermissible manner by retroactively applying certain statutes, regulations, and practices that were not in effect when he was convicted and sentenced in 1972. He seeks a declaration that these new policies significantly increased the chance that he would serve a longer sentence and that their use at his parole hearing violated his rights under the Ex Post Facto clause of the United States Constitution. He also seeks an order requiring the defendants to conduct a new parole hearing on his behalf consistent with the law and customs that were in effect on April 10, 1972.

Several motions are currently pending before the Court. They include Mr. Ridenour's motion for extensions of time to complete discovery and to file dispositive motions (# 44), his motions for the Court to take judicial notice (## 47, 48), his second motion to compel discovery (# 53), and his motion for leave to file an amended complaint (# 64). The defendants have also moved for summary judgment (# 54), and there are additional pending motions related to the summary judgment motion. These include the defendants' motion *in limine* to exclude various exhibits attached to plaintiff's response (# 66) and Mr. Ridenour's motions to strike the affidavit of Cynthia Mausser (# 69) and to supplement the summary judgment record (# 72). Mr. Ridenour has also requested the clerk (# 63) to provide him with a copy of the exhibits attached to memorandum in opposition to the defendants' motion for summary judgment. The Court will address each of these motions in turn.

### I.

#### A. *Plaintiff's Motion to Extend Pretrial Deadlines*

Fed.R.Civ.P. 16(b) requires the Court, in each civil action that is not exempt from that rule, to "enter a scheduling order that limits the time" to, *inter alia,* file motions and to complete discovery. The rule further provides that "[a] schedule shall not be modified except upon a showing of good cause . . ." *Id.*

Although the Court has broad discretion to modify its own pretrial orders, it must be remembered that "[a]dherence to reasonable deadlines is . . . critical to maintaining integrity in court proceedings," *Rouse v. Farmers State Bank,* 866 F.Supp. 1191, 1199 (N.D.Iowa 1994), and that pretrial scheduling orders are "the essential mechanism for cases becoming trial ready in an efficient, just, and certain manner." *Id.* at 1198. In evaluating whether the party seeking modification of a pretrial scheduling order has demonstrated good cause, the Court is mindful that "[t]he party seeking an extension must show that despite due diligence it could not have reasonably met the scheduled deadlines."

*Deghand v. Wal–Mart Stores, Inc.,* 904 F.Supp. 1218, 1221 (D.Kan.1995). The focus is primarily upon the diligence of the movant; the absence of prejudice to the opposing party is not equivalent to a showing of good cause. *Tschantz v. McCann,* 160 F.R.D. 568, 571 (N.D.Ind.1995). Of course, "[c]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Dilmar Oil Co. v. Federated Mut. Ins. Co.,* 986 F.Supp. 959, 980 (D.S.C.1997). Further, although the primary focus of the inquiry is upon the moving party's diligence, the presence or absence of prejudice to the other party or parties is a factor to be considered. *Inge v. Rock Financial Corp.,* 281 F.3d 613 (6th Cir.2002). It is with these standards in mind that Mr. Ridenour's motion for extension of time to complete discovery will be decided.

Mr. Ridenour seeks to extend the deadline for completion of discovery to November 30, 2009, and the deadline for filing his motion for summary judgment to December 31, 2009. The defendants object to this request except to the extent that these deadlines are extended to June 30, 2009, and July 30, 2009, respectively. The scheduling order entered on September 29, 2008, provided for completion of discovery by May 31, 2009, and required any motions for summary judgment to be filed no later than June 30, 2009. Mr. Ridenour filed his motion to extend these deadlines on May 15, 2009.

At this point in the litigation, the discovery deadline has passed and discovery is closed. The only additional discovery which Mr. Ridenour identifies as necessary in order for him to respond to the defendants' motion for summary judgment are the parole statistics for those prisoners who were paroled in 1972. The defendants have represented that no parole statistics currently exist for years prior to 1977. Extending the discovery period would, therefore, serve no useful purpose.

Mr. Ridenour likewise has failed to show good cause for extending the time for filing dispositive motions. The only basis for his request is that the defendants had not yet answered his first set of interrogatories and that their answers to his requests for admission were evasive. Mr. Ridenour, however, attached the defendants' answers to his interrogatories to his memorandum opposing summary judgment and he failed to identify which responses to his requests for admission were evasive. Furthermore, in his response to the defendants' motion, he asserts somewhat incongruously that there are genuine issues of material fact and that he is entitled to judgment in this case both as a matter of law and fact. He also submitted numerous exhibits which allegedly support this position. Given this extensive filing, the Court does not believe that additional time is needed for him to file his own summary judgment motion. If, in evaluating the defendants' motion, the Court concluded that there are no material factual disputes and that Mr. Ridenour is entitled to judgment, the Court could enter a judgment in his favor.

B. *Plaintiff's Motions to Take Judicial Notice*

Mr. Ridenour requests the Court to take judicial notice of the following "facts" pursuant to Fed.R.Evid. 201(d):

(1) Ohio Rev.Code §§ 2967.13 (eff. 3–18–1965) and 2967.25 (eff. 3–18–1969) established ten years as the maximum time he must serve before becoming eligible for parole;

(2) the defendants improperly applied Ohio Rev.Code § 2903.02 (which was not in effect when he was sentenced) at his May 23, 2008 parole hearing to increase his minimum parole eligibility from ten years to fifteen years;

(3) Ohio Rev.Code § 2967.25 (eff. 3–18–1969) provided that a prisoner serving consecutive sentences whose aggregate term exceeded fifteen years was eligible for parole after ten years;

(4) the defendants improperly applied Ohio Rev.Code § 2967.13 (eff. 6–13–2002) to Mr. Ridenour at his 2008 parole hearing so as to eliminate his eligibility for parole;

(5) Ohio Rev.Code § 2967.03 (eff. 3–18–1965) required OAPA to assess factors relevant to a determination of whether parole "would further the interests of justice and be consistent with the welfare and security of society;"

(6) Ohio Rev.Code § 2967.03 (eff. 11–23–05) limits the authority of the parole board to grant parole by requiring the board first to comply with the notice requirements of §§ 2930.16 and 2967.12 and to consider any written statement or testimony of the victim or victim's representative;

(7) Ohio Rev.Code § 5149.101 (eff. 4–29–2005) provides that the office of victims' services to petition the parole board for a hearing before the entire board;

(8) Ohio Admin. Code § 5120–1–1–07(B) (eff. 8–6–2007) adds the phrase "due to the serious nature of the crime" to the OAPA's criteria for determining whether parole "would further the interests of justice and be consistent with the welfare and security of society."

In a separate motion, Mr. Ridenour asks the Court to take judicial notice of the testimony of John Gerhart and Beverly Seymour before the Senate Finance & Financial Committee of the 128th Ohio General Assembly on May 20, 2009, an article entitled "Many ex-cons turn their lives around" by Dawson Bell, and excerpts from a report by the former director of ODRC concerning "Violent Offender Incarceration and Truth–in–Sentencing Application." The defendants oppose both motions on the grounds that the matters of which the plaintiff seeks judicial notice do not meet the standards set forth in Fed. R.Evid. 201.

Rule 201 by its own terms "governs judicial notice of adjudicative facts." The rule further provides that the facts to be noticed must not be subject to reasonable dispute and must fall into one of two types. The first kind involve facts that are "generally known within the territorial jurisdiction of the trial court." The second are those facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The requests for judicial notice made by Mr. Ridenour fail to meet either of these criteria.

Mr. Ridenour's first motion for judicial notice centers on Ohio statutes and regulations that were in effect either at the time he was convicted and sentenced or when he came before the parole board in 2008. As the Sixth Circuit Court of Appeals has pointed out, judges took judicial notice of statutes on a regular basis for more than a hundred years. *See United States v. Dedman,* 527 F.3d 577, 586 (6th Cir.2008). "This was an evidentiary shortcut whereby courts could rely upon the law of other states without jumping through the evidentiary hoops of bringing the bound volumes into court and establishing their validity." *Id.* More recently, however, the concept of "judicial notice" has been limited to facts alone, and "state law is simply a matter for the judge to determine." *Id.; see also Swartz v. Eastman & Smith,* 194 F.3d 1314 (table), 1999 WL 801570 at *2 (6th Cir. Sep. 28, 1999) (district court properly denied plaintiff's request to take judicial notice of various procedural rules, laws, and provisions of Code of Judicial Conduct as they did not involve adjudicative facts). The regulations which Mr. Ridenour asks the Court to take notice of are

matters of state law, and the Court can and will use these regulations in making its decision, but it does need formally to take judicial notice of them.

As for his second motion, the various articles and testimony before the Ohio Senate committee clearly are not the kind of adjudicative facts contemplated by Fed.R. Evid. 201. Although the fact that these individuals testified before the committee or authored the papers in question may not be subject to reasonable dispute, the content of such testimony or articles is certainly open to question particularly since Mr. Ridenour is offering them as proof of the defendants' habits, customs, and practices. Moreover, these "facts" are neither generally known throughout the jurisdiction of the Court nor capable of ready and accurate determination.

## C. *Plaintiff's Second Motion to Compel*

Mr. Ridenour complains that the defendants provided parole statistics from 1996 through 2008, but failed to comply with his requests for parole statistics from 1972 to 1996. He also objects to the defendants' redaction of several hundred pages of his parole file. In response to the plaintiff's second motion to compel, the defendants represent that, after further research, parole statistics related to the years 1977 and 1979–1997 were discovered and subsequently produced to Mr. Ridenour. The defendants assert, however, that after a thorough search, they were unable to locate any parole statistics that pre-date 1977. They further maintain that all redactions made to the plaintiff's parole file were done in accordance with administrative regulations in order to protect personal information and documents that might present a safety or security risk. The redactions included documents identifying the victim of any crime perpetrated by Mr. Ridenour, statements concerning the plaintiff made by informants, prosecutors, and judges, witness protection information, inmate separation information, juvenile criminal history, and diagnostic and testing of the plaintiff.

Mr. Ridenour did not reply to the defendants' memorandum in opposition to his second motion to compel. However, to the extent he is still demanding that the defendants produce parole statistics for the years 1972–1976, the Court observes that a party cannot be compelled to produce documents that do not exist or which it does not possess or control. *See Williams v. Schueler*, 2006 WL 1728123 (E.D.Wis. June 23, 2006); *Steil v. Humana Kansas City, Inc.*, 197 F.R.D. 445 (D.Kan.2000) (citing *Mike v. Dymon*, No. Civ. A. 95–2405–EEO, 1996 WL 674007, at *1 (D.Kan. Nov. 14, 1996); *Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, No. Civ. A. 89–2181–V, 1992 WL 739505, at *3 (D.Kan. Sept. 4, 1992)). Consequently, his second motion to compel (# 53) will be denied although should the defendants subsequently discover any earlier parole statistics, they shall be produced to Mr. Ridenour promptly. The Court also finds that the redactions are appropriate, and that the redacted information appears largely irrelevant to Mr. Ridenour's claims.

## D. *Plaintiff's Motion for Copy of Document 57 and Attachments*

Mr. Ridenour moves for an order directing the Clerk to provide him with a copy of his response in opposition to the defendants' summary judgment motion and his attached exhibits. He represents that he is unable to pay the estimated $77.00 copying charge and that, when he filed the document, he relied upon the alleged past practice of the Clerk to provide him with a time-stamped copy. He claims that many of the attachments are original exhibits that he will need in future proceedings in this action, including at trial.

Because the Court is recommending that the defendants' motion for summary judgment be granted, Mr. Ridenour's request that he be provided a copy of document # 57 will be denied at this time. Should summary judgment not be granted, the Court will reconsider his request at that time.

### E. *Plaintiff's Motion for Leave to File Amended Complaint*

Mr. Ridenour seeks leave to amend his complaint in two ways. First, he wishes to substitute Linda Janes, Chief of the OAPA, and Cynthia Mausser, Chairperson of the OAPA, as successors in office, for defendants Gary Croft and Harry Hageman. Second, he wants to add five new defendants and assert a new cause of action for damages against those defendants based on the separation of powers doctrine inherent in the United States Constitution. The new defendants would be sued under § 1983 in their individual capacities.

The defendants oppose the motion for leave to amend in its entirety. They maintain that because defendants Croft and Hageman were named in their official capacities and have ceased to hold public office, their successors are automatically substituted as defendants under Fed. R.Civ.P. 25(d). Accordingly, there is no need for Mr. Ridenour to amend his complaint to achieve this end. The defendants also object to the addition of new defendants and the proposed new claim for relief for two reasons: (1) such an amendment would be futile since the separation of powers doctrine only applies to the executive, legislative, and judicial branches of the federal government, and any claim based on the separation of powers doctrine would not be cognizable against state officials under § 1983; and (2) permitting the plaintiff to sue new defendants in their individual capacities after the deadlines for amendment of pleadings and discovery have passed and, more importantly, after

the filing of their motion for summary judgment, would be highly prejudicial to them.

Fed.R.Civ.P. 15(a) states that when a party is required to seek leave of court in order to file an amended pleading, "leave shall be freely given when justice so requires." The United States Court of Appeals for the Sixth Circuit has spoken extensively on this standard, relying upon the decisions of the United States Supreme Court in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) and *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), decisions which give substantial meaning to the "when justice so requires." In *Foman,* the Court indicated that the rule is to be interpreted liberally, and that in the absence of undue delay, bad faith, or dilatory motive on the part of the party proposing an amendment, leave should be granted. In *Zenith Radio Corp.,* the Court indicated that mere delay, of itself, is not a reason to deny leave to amend, but delay coupled with demonstrable prejudice either to the interests of the opposing party or of the Court can justify such denial.

Expanding upon these decisions, the Court of Appeals has noted that:

> [i]n determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction.

*Phelps v. McClellan,* 30 F.3d 658, 662–63 (6th Cir.1994) (citing *Tokio Marine & Fire Insurance Co. v. Employers Ins. of Wausau,* 786 F.2d 101, 103 (2d Cir.1986)). *See also Moore v. City of Paducah,* 790 F.2d 557 (6th Cir.1986); *Tefft v. Seward,* 689

F.2d 637 (6th Cir.1982). Stated differently, deciding if any prejudice to the opposing party is "undue" requires the Court to focus on, among other things, whether an amendment at any stage of the litigation would make the case unduly complex and confusing, *see Duchon v. Cajon Co.,* 791 F.2d 43 (6th Cir.1986) (per curiam), and to ask if the defending party would have conducted the defense in a substantial different manner had the amendment been tendered previously. *General Electric Co. v. Sargent & Lundy,* 916 F.2d 1119, 1130 (6th Cir.1990); *see also Davis v. Therm–O–Disc, Inc.,* 791 F.Supp. 693 (N.D.Ohio 1992).

The Court of Appeals has also identified a number of additional factors which the District Court must take into account in determining whether to grant a motion for leave to file an amended pleading. They include whether there has been a repeated failure to cure deficiencies in the pleading, and whether the amendment itself would be an exercise in futility. *Robinson v. Michigan Consol. Gas Co.,* 918 F.2d 579 (6th Cir.1990); *Head v. Jellico Housing Authority,* 870 F.2d 1117 (6th Cir.1989). The Court may also consider whether the matters contained in the amended complaint could have been advanced previously so that the disposition of the case would not have been disrupted by a later, untimely amendment. *Id.*

Although motions to amend are evaluated under the standards in Fed.R.Civ.P. 15(a), which states that leave to amend shall be given freely when justice so requires, that rule cannot be read in isolation. Rather, as the Court of Appeals has recently pointed out in *Leary v. Daeschner,* 349 F.3d 888 (6th Cir.2003), Rules 15(a) and 16(b) must be read together. Consequently, the Court is permitted to examine the standard factors governing amendments of the complaints under Rule 15(a) only if it is satisfied that any prior date for the filing of a motion for leave to amend either has been met or is properly extended under the good cause provisions of Rule 16(b).

The Court agrees with the defendants that the first branch of the plaintiff's motion to amend is unnecessary. Pursuant to Fed.R.Civ.P. 25(d), Linda Janes and Cynthia Mausser automatically were substituted as defendants when they succeeded to the positions of chief and chairperson of the OAPA, respectively. The Court, therefore, will deny this portion of the motion as moot.

As to the other branch of the motion to amend, the defendants have raised substantial doubt as to whether Mr. Ridenour may assert a separation of powers claim against the proposed new defendants. The claim is based on the OAPA's alleged exercise of authority over the modification of sentences. Mr. Ridenour argues that under the Ohio Constitution this function is reserved solely to the judiciary branch. Thus, Mr. Ridenour appears to rely on state law, and not federal law for his separation of powers claim. The Sixth Circuit has held that a claim based on the separation of powers between a state trial judge and a state prosecutor is not cognizable under federal habeas corpus and is purely a matter of state law. *Austin v. Jackson,* 213 F.3d 298, 302 (6th Cir.2000). The United States District Court for the Northern District of Ohio has applied this same principle to a § 1983 action brought against the parole board by a prisoner for changing his offense category. *See Louis v. Collins,* No. 3:08 CV 930, 2008 WL 2705038 at *6 (N.D.Ohio Jul. 8, 2008).

Mr. Ridenour's assertion in his reply that his separation of powers claim is not based solely on § 1983, but also on 42 U.S.C. § 1988 does not appear to save his claim. Section 1988 simply "instructs federal courts as to what law to apply in causes of action arising under federal civil

rights acts." *Moor v. Alameda County*, 411 U.S. 693, 703–04, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). It does not create an independent cause of action for alleged violations of constitutional rights. *See Schroder v. Volcker*, 864 F.2d 97, 98 (10th Cir.1988); *Harding v. American Stock Exchange, Inc.*, 527 F.2d 1366 (5th Cir.1976). *See also Otto v. Somers*, 332 F.2d 697, 699 (6th Cir.1964) (per curiam) (§ 1988 irrelevant to issues raised in taxpayer suit against municipal officials in absence of deprivation of federal right).

In addition, the Court believes that naming additional defendants and prosecuting the proposed separation of powers claim at this stage of the proceedings would add a level of complexity to this case and cause unnecessary confusion. What began as an official capacity suit seeking merely declaratory and injunctive relief would turn into a full-blown action in which the new defendants could face individual liability for their alleged deprivation of Mr. Ridenour's constitutional rights. Such a change would spawn further litigation involving questions such as the appropriate measure of damages and whether the defendants would be entitled to qualified immunity. Given these additional considerations, the defendants would almost certainly have conducted their defense differently had Mr. Ridenour tendered his amended complaint prior to the deadline established for amendment of pleadings.

The fact that Mr. Ridenour could have advanced his separation of powers claim at a much earlier date also militates against granting his motion for leave to amend. Mr. Ridenour concedes that the five defendants he seeks to add were "John Doe" defendants identified in the complaint as unknown parole board members and/or other officials. The fact that he did not discover until later the identity of the persons who allegedly participated in his May 23, 2008 parole hearing does not excuse his failure to plead his separation of powers claim at an earlier date. The facts supporting such a claim should have been apparent to him at the time he commenced this action or soon thereafter.

Lastly, Mr. Ridenour has not shown good cause for filing an amended complaint at this stage of the proceedings. Although the scheduling order entered September 29, 2008, did not contain a deadline for any amendments to pleadings, it did establish deadlines for completion of discovery and the filing of any summary judgment motions. Mr. Ridenour did not file his motion for leave to amend until these other deadlines had expired and the defendants had already filed their motion for summary judgment.

## F. *Defendants' Motion to Bar Use of Inadmissible Evidence*

The defendants seek to exclude from consideration numerous exhibits attached to Mr. Ridenour's memorandum opposing summary judgment. These exhibits consist of memoranda and statistical reports regarding the average time served by Ohio parolees for each calendar year from 1977 to 2007. The defendants argue that the statistical exhibits are irrelevant because they are not tailored to the plaintiff's "unique" factual circumstances. Mr. Ridenour offers the exhibits to show the likelihood of increased incarceration apparently caused by changes in parole policies since his conviction and sentence.

The standard for determining relevancy is "extremely liberal." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (citation omitted). In making this determination, a court must not consider the weight or sufficiency of the evidence. *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 475 (6th Cir.1996). "[E]ven if a district court believes the evidence is insufficient to prove the ultimate

point for which it is offered, it may not exclude the evidence if it has the slightest probative value." *Id.* (citation and internal quotation marks omitted).

While these exhibits encompass all parolees, Mr. Ridenour has highlighted the portions of the exhibits pertaining to male prisoners convicted of second degree murder. Because this is the most serious of the offenses for which he was convicted and sentenced, Mr. Ridenour has clearly made an effort to tailor the statistics to parolees in circumstances similar to his. Although the parolees may not have been convicted of other serious offenses or escape, as has Mr. Ridenour, the Court cannot say that the statistics have no probative value.

The defendants also challenge a number of other exhibits as inadmissible due to Mr. Ridenour's alleged failure to authenticate them. The exhibits can be grouped into two general categories. The first includes copies of either current or former statutes and regulations, as well as cases decisions relied upon by Mr. Ridenour. The second group appears to comprise letters, memoranda, and check sheets prepared by various employees of the ODRC and the parole board and Mr. Ridenour's sentencing entry.

It appears that these statutes and regulations are the same as those which were the subject of Mr. Ridenour's first motion for judicial notice. While the Court will determine the extant state law, the defendants have not argued that the copies of the statutes, regulations, and court decisions attached to the plaintiff's memorandum are not what they purport to be. Furthermore, it is not clear that Mr. Ridenour is even offering them as "evidence." The other documents which the defendants challenge may well have been produced by them in discovery. Courts have held that where a document is produced in discovery, there may be sufficient

circumstantial evidence to support its authenticity. *See Denison v. Swaco Geolograph Co.,* 941 F.2d 1416, 1423 (10th Cir. 1991); *see also Anand v. BP West Coast Products LLC,* 484 F.Supp.2d 1086, 1092 n. 11 (C.D.Cal.2007) (documents produced in response to discovery requests admissible on summary judgment motion as self-authenticating); *Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc.,* 46 F.Supp.2d 769, 772 (N.D.Ill.1999) (same). Accordingly, the Court will deny the defendants' motion *in limine* (# 66).

### G. *Plaintiff's Motion to Strike Affidavit of Cynthia Mausser*

Mr. Ridenour moves to strike the affidavit of Cynthia Mausser attached to the defendants' reply in support of their motion for summary judgment. He contends that because Ms. Mausser did not participate in his May 23, 2008, parole hearing, she has no personal knowledge as to what happened there. Mr. Ridenour also asserts that Ms. Mausser's affidavit contradicts certain specific admissions she purportedly made contained in Exhibits FF and GG, and that these admissions should be the only testimony from her which should be considered by the Court on the summary judgment record. He further objects to the absence of sworn or certified copies of OAC 5120:1–7(B)(8), "review of records," Senate Bill 2, and the case of *Ankrom v. Hageman,* 2005–Ohio–1546, 2005 WL 737833 (10th App. Dist.2005) to which she referred in the affidavit.

Rule 56 of the Federal Rules of Civil Procedure provides in relevant part:

A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred

to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

Fed.R.Civ.P. 56(e)(1).

Under Rule 56(e), an affidavit must show that the facts stated therein are based on personal knowledge. *See Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 956 (S.D.Ohio 2000). In this case, Ms. Mausser avers that her knowledge of Mr. Ridenour's history and of the reasons for which he was denied parole derives from her review of records of regularly conducted business activity as chairperson of the OAPA. Attached to her affidavit is a certified copy of the Ohio Parole Board's decision to deny Mr. Ridenour parole following a May 23, 2008 hearing.

Personal knowledge is not strictly limited to actions in which the affiant directly participated, but may be derived from reviewing the content of files and records. *See Washington Central R.R. Co. v. National Mediation Bd.*, 830 F.Supp. 1343, 1353 (E.D.Wash.1993). Under this criterion, the Court is satisfied that Ms. Mausser's affidavit is based on her personal knowledge of the records of Mr. Ridenour's parole hearing. To the extent some portions of the affidavit may not be based on personal knowledge, the proper remedy would not be to strike the entire affidavit, but for the Court simply to disregard those portions. *See Lee v. City of Columbus*, 644 F.Supp.2d 1000, 1005–06 (S.D.Ohio 2009) (citing *United States v. Hodges X–Ray, Inc.*, 759 F.2d 557, 561 (6th Cir.1985)).

The Court also does not agree that Ms. Mausser's statement in her affidavit that the parole board did not consider OAC 5120:1–1–7(B)(8) at Mr. Ridenour's May 23, 2008 hearing contradicts the defendants' response to his request for admission that the OAPA members and/or their agents applied the parole standard, statutes, rules, and guidelines that were in effect at the time of the hearing. It is not clear that the members are obliged to apply this subpart to cases such as Mr. Ridenour's where the Senate Bill 2 equivalent sentence would be longer than the original sentence imposed.

Lastly, the Court is authorized to apply Rule 56(e) with some leniency. *See Jones v. Rabanco, Ltd.*, 439 F.Supp.2d 1149, 1158 (W.D.Wash.2006). It is apparent from the memoranda he has filed in this case that Mr. Ridenour is familiar with OAC 5120:1–1–7(B) (8), Senate Bill 2, the *Ankrom* decision, and the relevant documents from his parole file, and, in fact, has his own copies of these papers. Given the lack of prejudice to Mr. Ridenour from the defendants' failure to attach the papers to Ms. Mausser's affidavit, the Court will not strike the affidavit on account of their failure strictly to comply with Fed.R.Civ.P. 56(e).

## H. *Plaintiff's Motion to Supplement Summary Judgment Record*

Mr. Ridenour seeks to supplement the summary judgment record with Plaintiff's Exhibits B and C, as well as the affidavit of Tony Leroy Logsdon. The two exhibits are certified copies of the *Ankrom* screening criteria and the central office review board's May 23, 2008 decision as to his parole. Mr. Logsdon is an individual who was convicted of two counts of second degree murder in 1973 and was sentenced to consecutive life sentences for each offense. Mr. Logsdon was granted parole in May 2003 and released the following month after serving thirty years and six months. Mr. Ridenour asserts that the case of Mr. Logsdon establishes an incarceration standard of fifteen years in 2003 for each conviction under R.C. § 2901.05, the same statute of which he was convicted. Mr. Ridenour believes that the notation on Exhibit C by one of the board members that

he wanted the plaintiff to serve forty years is evidence that the current standard is twenty years per conviction.

The defendants do not object to the admission of Plaintiff's Exhibits B and C. They contend, however, that Mr. Logsdon's affidavit is inadmissible on the grounds that it is irrelevant. As the Court noted earlier with respect to the parole statistics offered by Mr. Ridenour, even if it believes the evidence in the form of Mr. Logsdon's affidavit is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative value. Again, the Court can give this evidence whatever weight it deserves. Accordingly, the plaintiff's motion to supplement the summary judgment record (# 72) will be granted.

## II.

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed.R.Civ.P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear

the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion.

## III.

Mr. Ridenour was charged in an indictment with two counts of murder in the first degree (counts one and two), one count of shooting with intent to kill (count three), and two counts of assault with a deadly weapon (counts four and five). On April 10, 1972, he appeared before a three-judge panel in the Montgomery County Common Pleas Court. At that appearance, he changed his plea of not guilty to counts one and two and entered guilty pleas to the lesser included offenses of murder in the second degree. Mr. Ridenour also withdrew his not guilty pleas to counts three, four, and five, and entered pleas of guilty to those offenses as charged in the indictment. The court accepted his guilty pleas and sentenced him to two life terms on counts one and two. As to count three, the court imposed an indefinite sentence of one to twenty years. On counts four and five, Mr. Ridenour received sentences of one to five years each. The court further ordered that all sentences were to be served consecutively. *See* Plaintiff's Exhibit HH.

Mr. Ridenour subsequently escaped from prison, and after being recaptured, was convicted in May 1978 of two counts of kidnaping, one count of felonious assault, one count of aggravated burglary, and one count of escape. He received an aggregate sentence of four to twenty-five years to be served consecutively to his 1972 sentence. *See* Defendants' Exhibit 1, Affidavit of Cynthia Mausser ¶ 3. Since his escape in 1977, Mr. Ridenour has not been cited for any disciplinary conduct. *See* Ohio Parole Board Decision attached to Defendants' Reply (doc. 65). While in prison, he has completed a number of vocational and educational programs, including associate's and bachelor's degrees in computer operation, stress management, assertiveness training, and substance abuse programming. *Id.*

Mr. Ridenour remains incarcerated at the Chillicothe Correctional Institution in Chillicothe, Ohio. He first became eligible for parole in 1982 after serving ten years. *See* Ohio Rev.Code 2967.13(F). His most recent parole hearing was conducted on May 23, 2008, at which time he was again denied parole. *See* Affidavit of William L. Ridenour ¶¶ 3, 19, 20. The board applied the parole standards, statutes, rules and guidelines to Mr. Ridenour that were in effect on May 23, 2008, including Ohio Rev.Code Chapter 2967 and Ohio Admin. Code §§ 5120:1–1–07, 5120:1–1–10, and 5120:1–1–11. *See* Defendants' Answer to Plaintiff's Second Set of Requests for Admission No. 1 (Plaintiff's Exhibit FF p. 3) and Defendants' Responses to Plaintiff's First Set of Interrogatories Nos. 7, 8, 10 (Plaintiff's Exh. JJ). The board found that the multiple victims, coupled with the escape involving an assault and kidnaping, were aggravating factors that outweighed Mr. Ridenour's completion of a number of institutional programs and his excellent conduct for the past thirty years. The board, therefore, did not consider him suitable for release at that time and recommended a continuance of four years. *See* Ohio Parole Board Decision. The board checked one of the three boxes on the decision sheet corresponding to the reasons cited in AR 5120:1–1–07 for further incarceration:

There is substantial reason to believe that due to the serious nature of the crime, the release of the inmate into society would create undue risk to public safety, or that due to the serious nature of the crime, the release of the inmate would not further the interest of justice or be consistent with the welfare and security of society.

Ohio Admin. Code § 5120:1–1–07(A)(2). Mr. Ridenour's next scheduled parole hearing is May 1, 2012. *See id.* p. 2

## IV.

The State of Ohio may not impose ex post facto laws. *See* U.S. CONST. Art. I, § 10, cl. 1. Two elements comprise an ex post facto law: (1) it must apply to conduct that occurred before its enactment and (2) its application must adversely affect the offender. *See Dyer v. Bowlen,* 465 F.3d 280, 285 (6th Cir.2006). The relevant inquiry here is whether the parole board's application of the Ohio statutes and guidelines in effect on May 23, 2008, in its consideration of Mr. Ridenour's suitability for parole, "create[d] a sufficient risk of increasing the measure of punishment" for his crimes. *Michael v. Ghee,* 498 F.3d 372, 384 (6th Cir.2007) (citation and internal quotation marks omitted). Mr. Ridenour can establish an ex post facto violation by demonstrating that retroactive application of the statutes and guidelines on their face created a significant risk of increased incarceration. *Id.* Alternatively, if the statutes and guidelines do not by their own terms manifest a significant risk, he can prove such a violation through evidence drawn from the parole board's practical

implementation of these statutes and guidelines should that evidence show that their application resulted in a longer period of incarceration than would have been the case under the statutes and guidelines in effect at the time of his conviction and sentence. *Id.; Dyer,* 465 F.3d at 288.

Mr. Ridenour asserts that five different ex post facto violations occurred because five different statutes, regulations, and guidelines in effect at the time of his May 23, 2008 parole hearing, but not at the time of sentencing, were applied to determine his eligibility and/or suitability for parole. He asserts that each of these created a significant risk of prolonging his incarceration. Mr. Ridenour also contends that the parole board's practical implementation of each of these statutes, regulations, and guidelines at his parole hearing resulted in his serving a period of incarceration longer than he would have faced under the parole standards and practices in effect on April 10, 1972.

## A. Retroactive Application of OAC § 5120:1-1-07

Mr. Ridenour correctly notes that Ohio Admin. Code § 5120:1-1-07 did not exist at the time of his original conviction and sentence in 1972. The earliest version of this regulation had an effective date of October 15, 1975. *See* Defendants' Exh. 5. Its promulgation rescinded Administrative Regulation 911, filed on September 23, 1975. *See* Ohio Admin. Code 5120:1-1-07(B) (Exh. 5). Neither party submitted a copy of Administrative Regulation 911, and the Court in its own legal research could not locate it. It is, therefore, not known whether any version of AR 911 predated September 23, 1975. The October 15, 1975 version of OAC 5120:1-1-07, however, was apparently in effect at the time of Mr. Ridenour's subsequent conviction and sentence in 1978.

Mr. Ridenour argues that on their face two provisions of the January 1, 2007 version of OAC 5120:1-1-07 create a significant risk of increased incarceration. The first permits the parole board to determine that an inmate not be released at the time of his parole eligibility where there is substantial reason to believe that, *due to the serious nature of the crime,* the release would create an undue risk to public safety or would not further the interest of justice nor be consistent with the security and welfare of society. Ohio Admin. Code § 5120:1-1-07(A)(2) (emphasis added). The second provision is the requirement that the board consider the equivalent sentence range under Senate Bill 2 (eff. 7-1-96) for the same offense of conviction *if applicable.* Ohio Admin. Code § 5120:1-1-07(B)(8) (emphasis added).

Mr. Ridenour's contention that OAC 5120:1-1-07(A)(2) constitutes an ex post facto law rests on his assertion that the "serious nature of the crime" factor was not part of the previous parole scheme. This language, however, was present in the original version of OAC 5120:1-1-7(A)(2) which became effective on, October 15, 1976. *See* Defendants' Exh. 5. Similarly, OAC § 5120:1-1-08 (eff. 12-21-1976) listed the nature of the crime for which the inmate was convicted as a factor to be considered by the parole board at a release hearing.

Even before these guidelines were enacted, however, the parole board appropriately considered such factors as an inmate's prior criminal record. *See Jones v. Salisbury,* 25 Ohio Misc. 219, 422 F.2d 1326, 1327 (6th Cir.1970). "Such consideration does not constitute an imposition of additional punishment, but rather an attempt to assess the factors relevant to a determination of whether parole 'would be consistent with the welfare and security of society.'" *Id.* (quoting Ohio Rev.Code

§ 2967.03). *Jones* has been cited for the proposition that it is not arbitrary or capricious for the parole board to consider the "nature of the crime" to determine whether an inmate should be released. *See Coleman v. Ohio Adult Parole Authority*, 238 F.3d 420 (table), 2000 WL 1871680 at *2 (6th Cir. Dec. 11, 2000); *see also Riley v. Perini*, 422 F.2d 397 (6th Cir.1970) (parole authority may consider all relevant factors).

■ The Ohio Supreme Court has held that the seriousness of the inmate's offense is good cause for the parole board to continue his parole hearing for ten years. *State ex rel. Ferguson v. Ohio Adult Parole Authority*, 45 Ohio St.3d 355, 544 N.E.2d 674 (1989). That court has also held that the board may consider the fact that a prisoner had tried to escape and that, regardless of the basis for continuing parole consideration until a later date, such a continuance does not constitute a sentence by the parole board. *Barnhart v. Maxwell*, 2 Ohio St.2d 308, 309, 208 N.E.2d 752 (1965). It appears, then, that the parole board has for many years considered both the nature of the crime and the offender's conduct as relevant factors in determining whether to grant parole. Accordingly, Mr. Ridenour has not shown that the "serious nature of the crime" provision created on its face a significant risk of increased incarceration to an inmate convicted and sentenced prior to October 15, 1976.

The 1995 sentencing reforms heralded by Senate Bill 2 abolished indeterminate prison sentences in Ohio except for life imprisonment. *See* Ohio Rev.Code § 2929.14(A). The amended sentencing provisions by their express terms do not apply to persons convicted and sentenced prior to July 1, 1996. *See State ex rel. Lemmon v. Ohio Adult Parole Authority*, 78 Ohio St.3d 186, 187–88, 677 N.E.2d 347 (1997). Because OAC 5120:1–1–07(B)(8)

requires the parole board to consider the equivalent sentence range under Senate Bill 2 for the same offense of conviction only if the equivalent sentencing range is applicable, this provision does not on its face create a significant risk of increased incarceration to an inmate serving a life sentence. There simply is no equivalent sentencing range under Senate Bill 2 for a life sentence imposed on an inmate before July 1, 1996.

Mr. Ridenour argues the fact that the Ohio Parole Board's Decision (Plaintiff's Exh. K) actually lists a range of 480–life plus 72–252 months in the box corresponding to the equivalent Senate Bill 2 sentencing range means that the current parole standard was applied to him rather than the standard in effect when he was convicted and sentenced. Mr. Ridenour asserts that under the earlier standard, the average time served for a hypothetical inmate convicted of the same offenses for which he was imprisoned would have been 37.21 years. His calculations are based on "A Comparison of Time Served, in Years, of Male Penitentiary Parolees in 1982 by Offense Category." *See* Plaintiff's Exhibit II, Table 2. Mr. Ridenour has selected the average time served for each offense for which he was convicted (or what he apparently believes to be the most analogous offense where his actual crime is not listed), multiplied that by the number of counts, and then combined those totals to arrive at the 37.21 years.

The defendants argue that Mr. Ridenour's statistical analysis is seriously flawed, but that, if anything, his analysis proves that an inmate with as many felony convictions as the plaintiff should expect to serve an average of 37.21 years. They point out that Mr. Ridenour has only now reached that threshold and had not done so at the time of his May 23, 2008 parole hearing.

The defendants also contend that he misapprehends how the OAPA applies OAC § 5120:1–1–07(B)(8). They maintain that the box on the parole decision sheet for the equivalent Senate Bill 2 sentencing range was added as the result of the Ohio court of appeals' decision in *Ankrom v. Hageman,* 2005 WL 737833 (Ohio App. 10 Dist. Mar. 31, 2005). The defendants construe *Ankrom* as holding, in part, that where the minimum term of the Senate Bill 2 equivalent sentencing range is shorter than the minimum prison term prior to July 1, 1996, the parole board should take that fact into account when considering an inmate's suitability for parole. The defendants assert that where the minimum term of the Senate Bill 2 equivalent sentencing range is longer than the minimum sentence imposed prior to 1996, the parole board routinely gives this factor no consideration. *See* Mausser Affidavit ¶¶ 4, 5 (Exh. A attached to Defendants' Reply). Because Mr. Ridenour's situation fell into the second category, the board did not consider OAC § 5120:1–1–07(B)(8) at his May 23, 2008 parole hearing. *Id.*

The Court believes the arguments advanced by the parties are more properly considered in the context of whether Mr. Ridenour has come forward with evidence, drawn from the parole board's practical implementation of OAC § 5120:1–1–07(B)(8), to show that the application of this provision to his case resulted in a longer period of incarceration than he would have served under guidelines in effect at the time of his conviction and sentence. The Court concludes that he has not. The only evidence in the record is that the parole board did not consider OAC § 5120:1–1–07(B)(8) at Mr. Ridenour's May 23, 2008 parole hearing.

*B. Retroactive Application of R.C. § 2967.13*

■ Mr. Ridenour argues that the OAPA retroactively applied the provisions of Ohio Rev.Code § 2967.13 (eff. 6–13–2002) to him at his May 23, 2008 parole hearing, and that the application of this statute coupled with the 2007 parole guidelines significantly constrict his opportunity for early release. Under the 2002 version of § 2967.13, an inmate does not become eligible for parole until the expiration of the aggregate of the minimum terms of his sentence. Under the version of § 2967.13 in effect when Mr. Ridenour was convicted and sentenced, an inmate serving a life sentence or minimum terms of imprisonment longer than fifteen years, whether consecutive or otherwise, was eligible for parole after ten years. *See* Ohio Rev.Code § 2967.13 (eff. 3–18–1965).

Mr. Ridenour's claim that the OAPA retroactively applied the 2002 version of § 2967.13 to him is based on two references to his minimum sentence as Life. In Plaintiff's Exhibit A, the aggregate minimum sentence, the aggregate maximum sentence and the maximum expiration date are all listed as Life. In Defendant's Exhibit 1, Cynthia Mausser states that "[b]ecause Inmate Ridenour is serving a minimum life sentence, the 2007 Guidelines do not suggest a range of time that Plaintiff must serve before parole should be granted." *See* Mausser Aff. ¶ 6.

The Court does not see how these references show that the OAPA retroactively applied the 2002 version of § 2967.13 to Mr. Ridenour. It is unclear what effect such application would have had on his parole eligibility. A life sentence by definition does not appear to have a minimum term. Moreover, Mr. Ridenour's eligibility for parole after serving ten years has never seriously been in question.

Mr. Ridenour also points out that the 2007 Parole Guidelines (Plaintiff's Exh. F) changed the classification of murder from a Category 11 or 12 to Category 13. The corresponding guideline range for Catego-

ry 11 or 12 was expressed in terms of months while the guideline for Category 13 reflects Life at the high end of the ranges. By making this change, the OAPA intended to remove any previous impression or presumption that an inmate convicted of murder will be released after serving a definitive amount of time. The 2007 guideline also states that any "distinctions between the seriousness of the offenses will be addressed by the different minimum sentences required to be served before parole release eligibility, and when determining release suitability." Mr. Ridenour relies on these last five words to assert that the 2007 Parole Guidelines were applied impermissibly to determine his lack of parole suitability.

Mr. Ridenour's argument fails for two reasons. First, he has not shown that the parole board even considered the 2007 Parole Guidelines when it determined he was not suitable for release. Second, if the 2007 Parole Guidelines were applicable, the maximum end of the guideline range would be Life, which also is the maximum sentence for a person convicted of murder in the second degree. Accordingly, there is no applicable guideline range for Mr. Ridenour other than the indefinite sentence imposed by the Montgomery County Common Pleas Court. Without such a suggested range, there is no basis for Mr. Ridenour's claim that he faces a significant risk of serving longer than he would have under the parole standards in effect at the time of his conviction and sentence. *See Nur v. Mausser,* No. 1:08 CV 110, 2008 WL 1775249 at *3 (N.D.Ohio Apr. 15, 2008).

*C. Retroactive application of R.C. § 2903.02*

██ Mr. Ridenour claims that the OAPA also retroactively applied O.R.C. § 2903.02 to him at his May 23, 2008 parole hearing. He bases this argument on the fact that the decision sheet lists § 2903.02 as one of the offenses of which he was convicted. *See* Plaintiff's Exh. K. Ohio Rev.Code § 2903.02 provides that "[n]o person shall purposely cause the death of another" and that "[w]hoever violates this section is guilty of murder." Mr. Ridenour was actually convicted of murder in the second degree under former O.R.C. § 2901.05, the punishment for which was life imprisonment. The punishment for committing murder in violation of O.R.C. § 2903.02 is an indefinite term of fifteen years to life. *See* Ohio Rev.Code § 2929.02. A person convicted of murder would not be eligible for parole until he had served a minimum of fifteen years whereas a person convicted of murder in the second degree became eligible for parole after ten years. *Compare* Ohio Rev. Code § 2967.13 (eff. 6–13–2002) *with* former § 2967.13 (eff. 3–18–1965).

The problem with Mr. Ridenour's argument is that he indisputably became eligible for parole in 1982 after serving ten years. Therefore, retroactive application of § 2903.02 does not on its face create a significant risk of increased incarceration for an inmate convicted of murder in the second degree. In fact, as Mr. Ridenour concedes, there is nothing in this statute to indicate that the legislature intended it to apply retroactively. Furthermore, there is no evidence that the parole board denied Mr. Ridenour's release because it considered him ineligible for parole. But even had the board applied § 2903.02 to Mr. Ridenour at his May 23, 2008 hearing, there would have been no practical effect because he had already served more than fifteen years.

*D. Retroactive Application of Violent Offender Policies*

██ Mr. Ridenour argues that the policies created by the OAPA allegedly in response to the "Violent Crime Control

and Law Enforcement Act of 1994," 42 U.S.C. § 13701 *et seq.,* have created a sufficient risk of increasing the punishment attached to his offenses. He points to the certification by Director Wilkinson dated August 12, 1996, that the State of Ohio "has implemented, or will implement, correctional policies and programs, including Truth–in–Sentencing laws that ensure that violent offenders serve a substantial portion of the sentences imposed ..." *See* Plaintiff's Exh. E. He contends that Departmental Policy 105–PBD–03 (Plaintiff's Exh. R), while not actually referring to the Act or tracking its language, incorporates the basic principles of the federal statute. He also maintains that the OAPA incorporated this same violent offense classification and departmental policy into its 2007 Parole Guidelines.

The Court finds that Mr. Ridenour has failed to establish a genuine issue of material fact that Director Wilkinson's statutory assurance that Ohio has implemented or will implement correctional programs to ensure that offenders serve a substantial portion of their sentences has created a significant risk of prolonging his punishment. Mr. Ridenour concedes that Ohio has not adopted its own violent offender legislation. *See Shaw v. Frank,* No. 05–C–0872, 2008 WL 283007 at *11 (E.D.Wis. Jan. 31, 2008), *aff'd,* 288 Fed.Appx. 299 (7th Cir.2008) (court rejected ex post facto argument based on Wisconsin's similar statutory assurance where plaintiff submitted no proof that any laws were enacted pursuant to this agreement). Moreover, it is difficult to conceive how a law or policy ensuring that violent offenders serve at least 85% of their sentences would have affected Mr. Ridenour since he is serving a life term. *See* Complaint ¶ 24.

The Court likewise finds that Mr. Ridenour has failed to establish a genuine issue of material fact that either Departmental Policy 105–PBD–03 or the 2007 Parole Guidelines creates a risk of increasing his incarceration. For instance, one of the portions highlighted in Plaintiff's Exhibit R instruct the parole board to give "special attention to certain inmates and certain offenses to ensure public safety and public confidence." There is no evidence that this guideline was promulgated as a result of any agreement between Ohio and the federal government stemming from the Violent Crime Control and Law Enforcement Act of 1994. Such considerations have always been part of the OAPA's discretion to grant or deny release. *See* former Ohio Rev.Code § 2967.03 (eff. 3–18–1965). More importantly, Mr. Ridenour has not shown that these policies were actually applied to him or had any affect on the parole board's decision on May 23, 2008, to deny his release. Even had such policies been applied, the mere fact that a state has become less willing to release violent offenders and "now demands assurance that interests in deterrence, desert, and public safety have been satisfied before a murderer will be let free" does not implicate the ex post facto clause where an open-ended parole system is based on the board's discretion. *Grennier v. Frank,* 453 F.3d 442, 445 (7th Cir.2006).

### E. Retroactive Application of Ohio's Victims' Rights Statutes

Mr. Ridenour also claims that Ohio's victims' rights statutes create a sufficient risk of increasing punishment for his crimes. Ohio Rev.Code § 2967.12(B) requires the OAPA to notify a victim's representative of an inmate's impending release, if such notification has been requested. Under certain circumstances, a victim's representative may request a full board hearing and may have the right to testify at such a hearing.

■ There is some evidence that one or more victims' representatives may have

participated in some fashion in Mr. Ridenour's May 23, 2008 hearing. *See* Plaintiff's Exhibits L and X. This Court has previously held, however, that these statutory requirements are merely procedural and that the parole board retains its full discretion to grant or deny release. *See Clumm v. Warden, Chillicothe Correctional Institution,* No. 2:08–cv–365, 2008 WL 4346797 at *3. "A law that is merely procedural and does not increase a prisoner's punishment cannot violate the *Ex Post Facto* Clause even where applied retrospectively." *Id.* (citations and internal quotation marks omitted).

### F. Practical Implementation of Current Parole Statutes, Regulations, Guidelines, and Policies

■ Mr. Ridenour's final argument is that the practical implementation of the current parole statutes, Ohio Admin. Code § 5120:1–1–07, the victims' rights statutes, the violent offender policies, and Ohio Rev. Code § 2903.02 at his May 23, 2008 parole hearing resulted in his serving a longer period of incarceration than under the parole standards and practices which were in effect on April 10, 1972. He bases this contention on parole statistics from 1977 to 2007 showing an increase in time served for second degree murder and murder.

The defendants counter that this statistical evidence is not sufficiently tailored to Mr. Ridenour's circumstances and is therefore irrelevant. *See, e.g., Dyer,* 465 F.3d at 292 (case remanded for evidentiary hearing on plaintiff's claims with discovery limited to class of inmates with comparable convictions and sentences); *Dotson v. Collins,* 317 Fed.Appx. 439, 442 (6th Cir.2008) (plaintiff unable to obtain statistics showing that inmates situated similarly to him received longer sentences following change in guidelines because State controlled information necessary to create such statistics). They also question Mr. Ridenour's methodology of adding together the average time served for each of his ten offenses to arrive at what he would regard as the average time served by an inmate convicted of these crimes.

The Court agrees that Mr. Ridenour's statistics regarding time served by inmates convicted of murder and subsequently released fails to account for the other serious offenses of which he was convicted. The Court also agrees that his methodology using average time served for each of his offenses is flawed. Table 2 in Plaintiff's Exhibit II does not include offense categories for shooting with intent to kill or assault with a deadly weapon. Mr. Ridenour instead uses the average time served for felonious assault and aggravated assault, respectively, without explaining why such categories are appropriate. For these reasons, the Court does not view Mr. Ridenour's statistical evidence as probative.

Mr. Ridenour specifically argues that the incarceration standard for his most serious offenses (two counts of second degree murder) has increased from thirty years in 1996–99 to over 40 years in 2008. This supposition is based on his comparison of Plaintiff's Exhibits EE and L. Exhibit EE is a parole review screening recommendation sheet dated January 28, 1999. The guideline range for Mr. Ridenour is 384 months to life. This range is comprised of a recommended 300 months to life on the two murder convictions and an additional 84 months for his other offenses. Exhibit L lists the reasons given by one member of the parole board for denying Mr. Ridenour's release. That member voted to continue his parole hearing until he had served a total of forty years (twenty years per homicide).

The Court finds that this evidence fails to establish a genuine issue of material fact that fifteen years per homicide was ever the standard for releasing an inmate

convicted of murder or that the current standard is twenty years per homicide. Plaintiff's Exhibit L represents nothing more than one parole board member's opinion that Mr. Ridenour should not be released until he has served forty years and does not involve the application of any guideline. *See Grennier,* 453 F.3d at 445 (attitudes of public officials who administer a discretionary parole system do not violate the Constitution).

## V.

Based on the foregoing reasons, the Court denies Mr. Ridenour's motions for extension of time to complete discovery (# 44), for judicial notice (## 47, 48), to compel discovery (# 53), to order the clerk to provide a copy of his memorandum in opposition to summary judgment with attachments (# 63), for leave to file an amended complaint (# 64), and to strike the affidavit of Cynthia Mausser (# 69). The Court also denies the defendants' motion *in limine* (# 66). The Court grants in part Mr. Ridenour's motion to supplement the summary judgment record (# 72). It is further recommended that the defendants' motion for summary judgment (# 54) be granted and that this action be dismissed.

### *PROCEDURE ON OBJECTIONS*

If any party objects to this Report and Recommendation, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made

herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. Section 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).